**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **SUSAN STEIN,** | **CIVIL ACTION** |
| Plaintiff, | |
| *v.* | **NO. 19-5814-KSM** |
| **NEIL W. MATHESON,** et al., | |
| Defendants. | |

**MEMORANDUM**

**MARSTON, J.**                                                    **May 17, 2021**

Plaintiff Susan Stein brings claims for breach of contract, breach of fiduciary duty, tortious interference with contract and/or economic relations, and dissolution of limited liability company against her former employer, Defendant E4 Health Group, LLC, and two of the company's principals, Defendants Neil Matheson and Frank Galella.[1] (Doc. No. 1.) Defendants have moved for partial dismissal of the complaint. (Doc. No. 10.) For the reasons that follow, their motion is granted in part and denied in part.

## I.    *Factual Background*

Taking the factual allegations in the complaint as true, the relevant facts are as follows.

Plaintiff Susan Stein was the principal of Connexion Healthcare from 2000 through August 2018. (Doc. No. 1 at ¶ 12.) Connexion provided "scientific and promotional communications to pharmaceutical and biotech companies," and in her 18 years as the company's principal, Stein "built considerable goodwill in the healthcare community,

---

[1] Stein also sued Eric Schramm, another alleged principal of E4. However, the Court previously dismissed Schramm pursuant to a stipulation of dismissal by the parties. (*See* Doc. Nos. 27 & 28.)

especially . . . in connection with pharmaceutical and other forms of products and treatments in the space of oncology and rare diseases." (*Id.* at ¶ 13.)

In February 2018, Defendant Neil Matheson contacted Stein because he was interested in merging his company, Kiwi Healthcare Consulting LLC, with Connexion. (*Id.* at ¶¶ 14–15.) Over the next few months, Stein and her husband met multiple times with Matheson and Defendant Frank Galella — Matheson's friend and financial consultant — to discuss the potential merger. (*Id.* at ¶¶ 17–19.) During those initial negotiations, Matheson and Galella represented that Stein would have a 50% equity stake in the merged company, and they recommended that the new company build on Connexion's current infrastructure so that it could retain Connexion's pre-existing clients without having to enter new contracts. (*Id.* at ¶¶ 16, 20, 22.)

After months of negotiations, however, Galella ultimately determined that a merger was not possible because of "financial issues" — specifically, Connexion's accrued pension obligations. (*Id.* at ¶ 26.) The Steins agreed to personally satisfy the obligations, but they were unable to save the deal. (*Id.* at ¶¶ 27–28.) Although Kiwi Healthcare did not enter a formal merger with Connexion, Stein now argues that there was a *de facto* merger because Kiwi Healthcare changed its name, becoming Defendant E4 Health Group, LLC, migrated Connexion's clients to the new business, and used Connexion's employees for E4 business and projects.[2] (*Id.* at ¶¶ 28–29.)

---

[2] As mentioned above, during the parties' initial negotiations, Matheson "recommended that the merged company utilize Connexion's pre-existing employer identification number and infrastructure in order to retain Connexion's pre-existing clients without entering into new Master Service Agreements or other contracts." (Doc. No. 1 at ¶ 22.) But because these initial merger talks fell through, it is unclear from the complaint how and when E4 ultimately took on Connexion's clients and whether E4 retained Connexion's employer identification number and infrastructure. (*See id.* at ¶¶ 27–28 (stating without further explanation that "Kiwi Healthcare did not complete a formal merger with Connexion," but Matheson was nonetheless able to "migrat[e] Connexion's clients to E4").)

On August 13, 2018, Stein was offered a partner position in E4.  (*Id.* at ¶ 31, Ex. A.)  The offer letter provided that Stein would "be a partner in the business and member of the Board of Directors."  (*Id.* at ¶ 32.)  She would not have to report to anyone else, and "[a]ny decisions concerning [her] role, remuneration, incentives, and shareholding," were to "be made together" with Matheson and Gallela.  (*Id.* at ¶ 33.)  The letter states that the company was finalizing an operating agreement for E4 and that Stein would "have an opportunity to review and provide comments" before the final version was signed.  (*Id.* at ¶ 41.)

In her new role, Stein's responsibilities were "the success of E4 . . . including new business development, client service, hiring great talent, resources to deliver above and beyond expectation, full P&L [profits and losses] responsibility, helping to establish the culture of the company, team work, and the success of all parts of the group."  (*Id.* at ¶ 34.)  Stein's initial compensation was set at $225,000 per year, with review and adjustments every six months based on the company's performance, "with the goal of having [her] reach a market rate salary as soon as possible."  (*Id.* at ¶ 35.)  Stein was also given a 5% membership interest in E4, which would increase to 10% when the company achieved $1 million in fee revenue, with possible additional increases based on "performance criteria."  (*Id.*  ¶ 40.)  Finally, in addition to her salary and equity interest, Stein was eligible for benefits, including a car allowance, insurance benefits, and 401K contributions (*id.* at ¶ 38), as well as an incentive plan "that will pay [her] salary based on exceeding revenue and profit performance objectives" (*id.* at ¶¶ 36–37).

Shortly after beginning her new position, things began to go south for Stein.  She learned for the first time that Eric Schramm was also a partner in the company, and when Stein questioned the extent of Schramm's equity interest and the terms of his position, Matheson and Galella refused to disclose them.  (*Id.* at ¶¶ 43–44.)  In addition, Defendants never provided Stein

with the operating agreement for E4 or asked her for comments about its terms. (*Id.* at ¶ 46.) Nor was she given membership certificates or any other evidence of her interest in E4. (*Id.* at ¶ 47.) Employees were hired without her approval or input, and despite having "full P&L responsibility," Defendants refused to give her access to E4's profit and loss statements. (*Id.* at ¶¶ 48–49, 54–55.) Her salary was not adjusted after six months, but remained at $225,000 throughout her tenure with the company, and no incentive plan was implemented while she worked there. (*Id.* at ¶¶ 50–51.)

In mid-June 2019, after ten months of working for E4, Stein met with Matheson to discuss Defendants' failure to fulfill the terms of the offer letter, including their failure to provide profit and loss information, to review her salary after six months, to create an incentive/bonus plan, or to draft an operating agreement. (*Id.* at ¶¶ 56–57.) A few days later, on June 21, 2019, Stein sent a follow-up email, memorializing their conversation. (*Id.* at p. 25, Ex. B.) Later that day, Defendants issued a termination letter, providing 90 days' notice of termination "[c]onsistent with your letter of employment." (*Id.* at ¶ 58, Ex. C.) As to termination, the offer letter states:

> During the first 6 months of this contract either party may terminate the agreement by giving fourteen (14) days written notice. Should you[r] employment be terminated within the initial 6 month period, you will retain ownership of any clients you bring to E4 Health.
>
> Following this initial 6-month period this employment contract can be terminated by either party by giving ninety (90) days written notice. At that time ownership of all clients will remain with E4 Health Group, LLC.

(*Id.* at ¶ 60, Ex. A.) Per this provision, all of Connexion's clients remained with E4 when Stein was forced to leave the company. (*Id.* at ¶ 61.)

Stein claims that Defendants acted to:

deceive Ms. Stein, stonewall her repeated and reasonable requests for information

to which she was entitled, take advantage of her good-faith performance of her duties, and trade upon Ms. Stein's client relationships — and then, nearly as soon as Defendants possibly could, and as soon as Ms. Stein demonstrated an unambiguous intention to formalize her rights as a Partner per the terms of the Offer Letter, Defendants terminated their employment relationship with Ms. Stein and have wrongfully claimed Ms. Stein's clients as Defendants' own.

(*Id.*) Stein claims that under the *de facto* merger, she remains a member of E4 and has been "subject to the oppression of the majority members, including Defendants Matheson, Galella, and Schramm." (*Id.* at ¶ 62.)

On December 10, 2019, Stein brought this action against Matheson, Galella, Schramm, and E4. (*See generally* Doc. No. 1.) The complaint asserts four counts: (1) breach of contract, (2) breach of fiduciary duty, (3) tortious interference with contract and/or economic relations, and (4) dissolution of limited liability company. (*See generally* Doc. No. 1.) Schramm has since been dismissed from the case. (*See* Doc. Nos. 27 & 28.) The remaining Defendants now move to dismiss Counts I and III. (Doc. No. 10.)

## II.     *Subject Matter Jurisdiction*

Before ruling on the Defendants' motion to dismiss, we must first confirm that we have subject matter jurisdiction. Stein argues that we have jurisdiction under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and the action is between citizens of different states. (Doc. No. 37.) Defendants counter that we do not have diversity jurisdiction because at the time the complaint was filed, both Stein and E4 were citizens of Pennsylvania.[3]

---

[3] Defendants also argue that the amount in controversy does not exceed $75,000 because they "vehemently dispute that they owe plaintiff anywhere near" that amount. (Doc. No. 38 at p. 1 n.1.) But Defendants' dispute, however vehement, of how much they "owe" Stein, is not relevant to the amount in controversy inquiry. Instead, to decide the amount in controversy, the Court looks only to the "complaint itself, unless it appears or is in some way shown that the amount stated in the complaint is not claimed in good faith." *Horton v. Lib. Mut. Ins. Co.*, 367 U.S. 348, 353 (1961). Here, the complaint seeks compensatory damages "in excess of $150,000," and Defendants have not suggested that his amount is claimed in bad faith. (*See* Doc. No. 1 at p. 17.) The amount in controversy requirement is satisfied.

(Doc. No. 38.)

"To satisfy the jurisdictional requirements of 28 U.S.C. § 1332(a)(1), the federal diversity statute, diversity must be complete; that is, no plaintiff can be a citizen of the same state as any of the defendants." *Midlantic Nat'l Bank v. Hansen*, 48 F.3d 693, 696 (3d Cir. 1995). A "natural person is deemed to be a citizen of the state where he is domiciled," and "the citizenship of an LLC" is determined "by the citizenship of each of its members." *Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 418–20 (3d Cir. 2010). In both cases, the inquiry turns on "the citizenship of the parties at the time the complaint was filed." *Midlantic Nat'l Bank*, 48 F.3d at 696.

Defendants argue that under the offer letter, E4 agreed that Stein "would own 5% of the membership interests" in the company and that she would "retain [her] ownership should the company terminate [her] employment for any reason other than cause." (Doc. No. 1 at p. 22; *see also* Doc. No. 38 at p. 3.) They reason that because Stein was not terminated for cause, she remained a member of E4 at the time she filed this action, and there is no diversity because E4 and Stein were both citizens of Pennsylvania. (Doc. No. 38 at p. 3.) We are not convinced.

Defendants are correct that under the offer letter, E4 agreed to give Stein a membership interest in the company. However, there are no facts suggesting that E4 followed through on that promise. Defendants argue that Stein was a member of E4 because membership in a California LLC merely requires the "consent of all the members." (Doc. No. 38 at p. 6.) *See* Cal. Corp. Code § 17704.01(c)(3). But it is not clear that Galella, who all parties agree is a member of E4, consented to Stein's membership.

During his deposition, Galella acknowledged that the offer letter promised Stein a 5% interest in the company. But when asked if E4's accounting firm knew about that interest,

6

Galella states only that the firm was provided "with the company records indicating the *official ownership of the organization* as recorded with the State of California." (Doc. No. 38-2 at 94:3–6 (emphasis added).) Among those filings is E4's Form LLC-12 Statement of Interest, which Galella filed with the State of California in December 2018. The only members listed on that form are Neil Matheson and Frank Galella.[4] *See* Cal. Corp. Code § 17702.09(a)(5) (requiring that a member-managed LLC indicate on this form "the name and business or residence address of *each member*" (emphasis added)). Notably, this document was filed *four months after* E4 gave Stein the offer letter. Moreover, in August 2019, Galella filed a Statement of No Change, certifying that there "has been no change in any of the information contained in the previous Statement of Information filed with the California Secretary of State."[5]

Given these facts, the Court finds that although E4 agreed to give Stein a membership interest in E4, she was not actually made a member of the company. Therefore, at the time the complaint was filed, E4's citizenship was the same as that of Matheson and Galella— California and New Jersey. Because there is complete diversity and the amount in controversy exceeds $75,000, the Court has diversity jurisdiction.

---

[4] The Court may take judicial notice of the company's official filings with the California Secretary of State. *See Odrick v. Scully Co.*, 2018 WL 6044929, at *1 n.4 (E.D. Pa. Nov. 19, 2018) ("The Court will take judicial notice of the Secretary of State search results."); *cf. Oran v. Stafford*, 226 F.3d 275, 289 (3d Cir. 2000) (taking judicial notice of SEC filings). These filings are publicly available through the business search tool on the Secretary of State's website: https://businesssearch.sos.ca.gov/.

[5] These filings also suggest that Schramm was not a member of the company. However, even if Schramm was a member of E4, when the complaint was filed, he was a citizen of California, so his inclusion does not ruin diversity.

### III.     Motion to Dismiss

#### A.     Standard of Review

When reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court must accept as true the factual allegations in the complaint and all reasonable inferences that can be drawn from those allegations. *Zuber v. Boscov's*, 871 F.3d 255, 258 (3d Cir. 2017). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

"As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). "However, an exception to the general rule is that a document *integral to or explicitly relied* upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment." *Id.* (cleaned up). Because the complaint explicitly relies on the terms of the offer letter and a copy of the letter is attached to the complaint, we consider it in deciding Defendants' motion.

#### B.     Discussion

Defendants move to dismiss Stein's claims in Count I (breach of contract) and Count III (tortious interference with contract and/or economic relations). We address each count in turn.

### 1.    *Count I:  Breach of Contract*

In Count I, Stein alleges that she had "a contractual relationship . . . with Defendant E4 by way of the Offer Letter, and with Defendants Matheson [and] Galella . . . by way of her partnership in E4."  (Doc. No. 1 at ¶ 64.)  She claims Defendants breached these contracts by:

(1) failing to adjust her compensation after six months;

(2) denying Stein access to financial records;

(3) making employment decisions without Stein's knowledge, input, or approval;

(4) denying access to information about the equity interests of the individual Defendants;

(5) wrongfully terminating Stein as a partner and/or employee of E4;

(6) failing to raise Stein's equity interest in E4; and

(7) failing to develop and implement an incentive program for Stein in E4.

(*Id.* at ¶ 65.)

To state a claim for breach of contract, the plaintiff must establish:  "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages."  *Gorski v. Smith*, 812 A.2d 683, 692 (Pa. Super. Ct. 2002).[6]  We address Stein's claims against the individual Defendants before turning to her claims against E4.

### a.    *Claims Against Matheson and Galella*

Defendants argue that the breach of contract claim fails against Matheson and Galella, because the only contract that Stein identifies in the complaint is her offer letter from E4.  (Doc.

---

[6] Although both sides suggest that the company's internal operations are governed by California's corporate regulations (*see* Doc. No. 17 at p. 10; Doc. No. 38 at pp. 2–3), they each rely on Pennsylvania law for their arguments on the motion to dismiss, and neither side has asserted that there is a choice of law problem (*see, e.g.*, *id.* at p. 12 ("Defendants' termination of Plaintiff . . . was also itself wrongful under the well-settled principle of *Pennsylvania law* . . . ." (emphasis added); *see also, e.g.*, Doc. No. 10-2 at p. 9 ("For purposes only of this motion, defendants apply *Pennsylvania law* to the parties' contract." (emphasis added))).

No. 10-2 at p. 5.)  The Court agrees that because the individual Defendants are not parties to the offer letter, they cannot be held liable for a breach of its terms.  *See QVC, Inc. v. Resultly, LLC*, 159 F. Supp. 3d 576, 583 (E.D. Pa. 2016) ("Given that Resultly was not a party to either contract, and that it is fundamental contract law that one cannot be liable for a breach of contract unless one is a party to that contract, QVC's contract claims against Resultly must fail unless they can survive on another theory." (cleaned up)); *Commonwealth v. BASF Corp.*, No. 3127, CONTROL NO. 120186, 2001 WL 1807788, at *12 (Pa. Ct. Comm. Pl. March 15, 2001) (explaining that it is "fundamental contract law that one cannot be liable for a breach of contract unless one is party to that contract" (quoting *Electron Energy Corp. v. Short*, 597 A.2d 175, 178 (Pa. Super. Ct. 1991))).

Seeming to acknowledge as much, Stein responds that she "and the individual Defendants were party to at least one separate contractual agreement:  the operating agreement of E4."  (Doc. No. 17 at p. 4.)  As evidence that the operating agreement exists, Stein points to the offer letter, which states that Defendants were "finalizing the E4 Health Operating Agreement," and that this agreement would govern any transfer of Stein's "equity stake in the business" and the "process for retaining or liquidating your membership interest when your employment is terminated."  (*Id.* at p. 5; Doc. No. 1 at p. 22.)

Although the offer letter shows that the parties were contemplating a mutually agreeable operating agreement, Stein has not alleged that the agreement was in fact finalized.  In other words, despite Stein's assurances that it is "clear that an operating agreement for E4 was adopted" (*see* Doc. No. 17 at p. 5), she has failed to allege any facts suggesting the existence of a final contract.  *See Key Consol. 2000, Inc. v. Troost*, 432 F. Supp. 2d 484, 487 (M.D. Pa. 2006) ("[A] cause of action for breach of contract must be established by pleading (1) the existence of a

contract, including its essential terms . . . .").  Notably, Stein does not allege when the operating agreement was finalized, that she was party to that agreement, that the individual Defendants were parties to the agreement, or that she has ever seen the agreement or been told that it was finalized without her review.  *Cf. Grant Mfg. & Alloying, Inc. v. Recycle is Good LLC*, Civil Action No. 11-3115, 2012 WL 3205514, at *3 (E.D. Pa. Aug. 7, 2012) (finding existence of a contract for the sale of scrap metal where the plaintiff alleged the date the agreement was reached, attached a copy of the email that constituted the alleged sale contract, and identified the material terms of the agreement, including processing charges, prices, and representations about the scrap metal); *Temple Univ. of Com. System of Higher Educ. v. Johanson*, No. 353, CONTROL 092011, 2001 WL 1807410, at *1 (Pa. Ct. Comm. Pl. Nov. 15, 2001) (finding the complaint "properly pleads the existence of a contract, including its essential terms" where the plaintiff alleged "that it executed a contract with Johanson on September 1996 and then a second agreement on October 1996," which included the defendant's salary, a ten mile radius provision, and a waiver clause).

And even if we could assume that the parties finalized the operating agreement without her review, Stein has failed to identify any of the agreement's essential terms.  *ProtoComm Corp. v. Fluent, Inc.*, Civ. A. No. 93-0518, 1995 WL 3671, at *14 (E.D. Pa. Jan. 4, 1995) ("In Pennsylvania, in order to create an enforceable contract, the parties must set out the terms for the agreement with specificity.").  Although Stein identifies the subjects that the operating agreement was expected to address — including the transfer and/or sale of Stein's equity interest — there is no indication that those terms were ultimately decided, how they were decided, and whether they were included in the final operating agreement.  *See id.* (explaining that a contract's terms must be "sufficiently definite to be specifically enforced").  Instead, the

offer letter suggests that Stein and E4[7] agreed to enter a mutually agreeable operating agreement in the future. But agreements to agree are not enforceable. *See Highland Sewer & Water Auth. v. Forest Hills Mun. Auth.*, 797 A.2d 385, 390 (Pa. Commw. Ct. 2002) ("An agreement to agree is incapable of enforcement, especially when it is stipulated that the proposed contract shall be mutually agreeable."); *see also Harmon v. Thomas*, No. 1958 EDA 2018, 2019 WL 1968231, at *3 (Pa. Super. Ct. May 1, 2019) (finding that a provision in a marital settlement agreement was "merely an 'agreement to agree' and is, therefore, unenforceable"). Because Stein has not alleged the existence of a contract between herself and the individual Defendants, the Court dismisses Count I as against them. However, we will give Stein an opportunity to amend her complaint to cure, if she can, the issues identified in this Memorandum.

### b. Claims Against E4

As for the claims against E4, Defendants argue that these claims fail as well because Stein has not identified a contractual duty that E4 breached. (Doc. No. 10-2 at pp. 5, 9.) Specifically, Defendants argue that for five of the seven alleged breaches, Stein has not alleged a corresponding duty, and for the remaining two breaches, Stein has not alleged that she satisfied the conditions precedent needed to trigger E4's duties under the offer letter. (*Id.* at p. 12.)

We begin with the five alleged breaches for which Defendants argue there was no corresponding duty: (1) failing to adjust her compensation after six months; (2) denying Stein access to financial records; (3) making employment decisions without Stein's knowledge, input, or approval; (4) denying access to information about the equity interests of the individual Defendants; and (5) wrongfully terminating Stein as a partner and/or employee of E4. As to

---

[7] Stein's claim against the individual Defendants also fails because she has not alleged any facts suggesting they "manifested an intent to be bound" by the terms of the operating agreement. *See ProtoComm Corp.*, 1995 WL 3671, at *14.

these five claims, Stein seems to concede that E4 did not breach the explicit terms of the offer letter, and instead, argues that the company nonetheless breached the duty of good faith and fair dealing implicit in the contract. (Doc. No. 17 at p. 7.)

"Every contract in Pennsylvania imposes on each party a duty of good faith and fair dealing in its performance and its enforcement." *Donahue v. Fed. Exp. Corp.*, 753 A.2d 238, 242 (Pa. Super. Ct. 2000); *see also Burton v. Teleflex Inc.*, 707 F.3d 417, 432 (3d Cir. 2013) ("Pennsylvania law generally recognizes a duty of good faith in the performance of contracts."). "Good faith has been defined as honesty in fact in the conduct or transaction concerned." *BASF Corp.*, 2001 WL 1807788, at *12. "The obligation to act in good faith in the performance of contractual duties varies somewhat with the context," but Pennsylvania courts have recognized "certain strains of bad faith which include: evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance." *Somers v. Somers*, 613 A.2d 1211, 1214 (Pa. Super. Ct. 1992) (citations omitted).

That said, the duty of good faith and fair dealing "does not create independent substantive rights nor can it override the express contractual terms." *BASF Corp.*, 2001 WL 1807788, at *12; *see also Burton*, 707 F.3d at 432 (explaining that the duty of good faith and fair dealing "does not create independent substantive rights" (quotation marks omitted)). Instead, the duty of good faith serves to "fill in those terms of a contract that have not been expressly stated."[8]

---

[8] "A similar requirement of good faith has been imposed under a contract doctrine developed in Pennsylvania case law called the 'doctrine of necessary implication.'" *Somers*, 613 A.2d at 1214 (quoting *Frickert v. Deiter Bros. Fuel Co.*, 347 A.2d 701, 705 (1975) (Pomeroy, J., concurring)). Under this doctrine, "in the absence of an express provision, the law will imply an agreement by the parties to a contract to do and perform those things that according to reason and justice they should do in order to carry out the purpose for which the contract was made and to refrain from doing anything that would destroy or injure the other party's right to receive the fruits of the contract." *Id.* (quoting *Frikert*, 347 A.2d at 705 (Pomeroy, J., concurring).)

*Academy Indus., Inc. v. PNC Bank, N.A.*, Nos. 2383 MAY TERM 2000, 0634 JULY TERM 2000, 2002 WL 1472342, at *8 (Pa. Ct. Comm. Pl. May 20, 2002); *see also Pa. Chiropractic Ass'n v. Indep. Blue Cross*, No. 2705, CONTROL NO. 111113, 2001 WL 1807781, at *6 (Pa. Ct. Comm. Pl. July 16, 2001) ("[T]he implied duty of good faith cannot act to displace the express terms and there can be no implied duty as to any matter specifically covered by the written agreement."); *cf. Baker v. Lafayette Coll.*, 504 A.2d 247, 256 (Pa. Super. Ct. 1986) (holding that "when an employer such as the College here expressly provides in an employment contract for a comprehensive evaluation and review process, we may look to the employer's good faith to determine whether the employer has in fact performed those contractual obligations"). For that reason, there is no "separate cause of action for breach of either an express or implied duty of good faith, absent a breach of the underlying contract." *BASF Corp.*, 2001 WL 1807788, at *12–13 (finding that the plaintiff had not stated a cause of action for breach of contract where it "failed to allege that Knoll failed to or improperly performed one of its duties imposed by the Agreement" because "absent a breach of contract there is no independent duty of good faith under Pennsylvania law").

*Somers v. Somers* is instructive. In that case, the defendant hired his uncle as an at-will consultant for a construction project that the nephew's company was completing for the New York Office of General Services ("OGS"). 613 A.2d at 1212. The parties' employment agreement stated that as compensation, the uncle would receive 50% of the net profits once all claims were resolved with the OGS. *Id.* The uncle was ultimately terminated, and after his termination, he brought a breach of contract claim against the company and his nephew, alleging that they breached their "implied and express obligations to negotiate, arbitrate settle in good faith the claims between the [company] and the OGS," thereby depriving him of around $3

million as his share of the proceeds.  *Id.* at 1213, 1215.

The Pennsylvania Superior Court held that the plaintiff stated a claim for breach of contract.  *Id.* at 1214.  There was "no express term in the contract requiring defendants to act in good faith, using due diligence in negotiating for payment with OGS" about the project, nor was there "an express term requiring [the defendants] to perform those things according to reason and justice, so as not to injure [the plaintiff's] right to receive the fruits of the contract, that is 50% of the profits" from the project.  *Id.*  Instead, "these obligations [were] implied in the contract" between the plaintiff and the defendants.  *Id.*; *see also Baker*, 504 A.2d at 255 (finding that the plaintiff's employment contract "contained certain undertakings by the College pertaining to the evaluation of faculty members," and that "to the extent the College undertook to evaluate [the plaintiff], the evaluation and review process must be honest and meaningful, not a sham formality to ratify an arbitrary decision already made").

With this standard in mind, we find that Stein has stated a claim for breach of contract as to three of the first five claims under the theory that E4 breached its duty of good faith and fair dealing.

### i.    *Failing to Adjust Stein's Compensation*

First, as to the salary adjustments, the offer letter states that Stein's salary "will be reviewed every 6 months based on the performance of the company with the goal of having [her] reach a market rate salary as soon as possible."  (Doc. No. 17-1 at p. 3.)  Although E4 was not expressly required to raise Stein's salary every six months, the contract contemplates that E4 would in good faith review her salary based on the performance of the company, and if the company's performance permitted it, Stein's salary would be adjusted until it "reach[ed] a market rate."  (*Id.*)  Stein argues that E4 expressly breached that provision when it failed to hold

a review at any point during the year she was employed with the company (*see* Doc. No. 17 at p. 8; *see also* Doc. No. 1 at p. 25 (asking ten months into her employment whether there will be a formal review)), and that it also breached the implied duty of good faith by "eva[ding] the spirit of the bargain" to bring Stein's salary to a market rate (*see* Doc. No. 17 at pp. 8–9). *See Somers*, 613 A.2d at 1214 (finding bad faith includes "evasion of the spirit of the bargain, . . . willful rendering of imperfect performance, [and] abuse of a power to specify terms"). We will allow this claim to go forward.

### ii. Denying Stein Access to Financial Records

The Court will also allow Stein's breach of contract claim to go forward as to E4's refusal to give her access to the company's financial records. The offer letter gives Stein "full P&L responsibility" and makes her responsible for "new business development" and the "success of all parts of the group." Stein argues that she was unable to fulfill these central responsibilities because E4 would not give her access to the company's finances, including profits and losses. Stein has sufficiently alleged that E4 had a duty to cooperate in good faith under the contract and that it breached that duty when it refused to give her the information she needed to perform her duties. *See Somers*, 613 A.2d at 1214 (finding that "bad faith" includes "interference with or failure to cooperate in the other party's performance").

### iii. Making Employment Decisions

For similar reasons, we will also allow Stein's breach of contract claim to move forward as it relates to E4's failure to inform her about employment decisions. The offer letter states that she is responsible for "hiring great talent . . . helping to establish the culture of the company, team work, and the success of all parts of the group." (Doc. No. 1 at p. 19.) E4 had an implicit duty to cooperate with Stein so that she could fulfill these obligations, and Stein has sufficiently

alleged that it breached that duty when it kept relevant information from her and excluded her from important employment decisions.  The motion to dismiss is denied as to this claim as well.

### iv.    *Denying Stein Access to Information About Members*

We will, however, grant the motion to dismiss to the extent that Stein argues she was denied access to information about the equity interests of Matheson, Galella, and Schramm. Although the offer letter states that Stein is a "partner in the business" and a "member of the Board of Directors," it does not state that she is entitled to the financial information of other members or charge her with making decisions about those financials.  (*See generally* Doc. No. 17-1.)  Instead, the letter states that "[a]ny decision concerning *your* role, remuneration, incentives, and shareholding will be made together with Frank and me."  (*Id.* at p. 2 (emphasis added); *see also id.* at p. 5 ("*Your* shareholding will be increased again once certain performance criteria have been met — these criteria will be mutually agreed between us." (emphasis added).) Because Stein has not alleged a contractual duty, express or implied, on the part of E4 to share this information, we must dismiss this breach of contract claim.  *See myService Force, Inc. v. Am. Home Shield*, Civil Action No. 10-6793, 2013 WL 1773799, at *5 (E.D. Pa. Apr. 25, 2013) (explaining that the duty of good faith cannot be used to "create new contractual rights or obligations, nor can it be used to circumvent or alter the specific terms of the parties' agreement" (cleaned up)).

### v.    *Wrongful Termination*

We will also dismiss Stein's claim that E4 breached the offer letter when it terminated her as an employee of E4.[9]  The only express condition to E4 firing Stein was that it give 90-

---

[9] We express no opinion at this time about Stein's suggestion that despite being fired as an employee of E4, she retains an equity interest in the company.

days' notice, and Stein concedes that condition was satisfied here. (Doc. No. 1 at pp. 20, 27.) Stein argues that she "has sufficiently alleged that Defendants exercised their 'right' to terminate Plaintiff in bad faith — not for any legitimate business reason." (Doc. No. 17 at p. 11.) But Pennsylvania courts have consistently held that absent a contractual provision or statute to the contrary, there can be "no bad faith when an employer discharges an at-will employee," whether it be "for good reason, bad reason, or no reason at all."[10] *Green v. Bryant*, 887 F. Supp. 798, 803 (E.D. Pa. 1995); *see also, e.g.*, *Nix v. Temple Univ. of Com. Sys. of Higher Educ.*, 596 A.2d 1132, 1135 (Pa. 1991) ("[I]n Pennsylvania an at-will employment environment is the norm, absent a contract to the contrary, and thus, an employee can be terminated for good reason, bad reason, or no reason at all.").

Similarly, Stein cannot rely on the duty of good faith and fair dealing to state a claim for wrongful termination because she was an at-will employee. *See Donahue*, 753 A.2d at 243 ("Appellant cannot as a matter of law maintain an action for breach of the implied duty of good faith and fair dealing, insofar as the underlying claim is for termination of an at-will employment relationship."); *see also Neff v. PKS Holdings, LLC*, No. 5:18-cv-1826, 2019 WL 3729568, at *12–13 (E.D. Pa. Aug. 8, 2019) (dismissing the plaintiff's claim that her former employer "breached an implied covenant of good faith and fair dealing by terminating her without good

---

[10] Pennsylvania recognizes a "firmly entrenched presumption" that employment is at-will. *Rapagnani v. Judas Co.*, 736 A.2d 666, 669 (Pa. Super. Ct. 1999). To overcome this presumption, an employee must establish: "(1) an agreement for a definite duration; (2) an agreement specifying that the employee will be discharged for just cause only; (3) sufficient additional consideration; or (4) an applicable recognized public policy exception." *Id.* (quotation marks omitted). Here, Stein has not argued or alleged that she was anything other than an at-will employee. We also note that her offer letter with E4 lacks a definite duration, and it explicitly allows either party to end the employment relationship at any time, with or without cause. (*See* Doc. No. 1 at p. 20.) In addition, Stein has not identified any additional consideration or an applicable public policy exception. (*See generally id.*) Therefore, we are compelled to find that Stein is an at-will employee. However, Stein will be given an opportunity to amend her complaint if she can plausibly allege that she was not an at-will employee.

cause," because although the plaintiff alleged that the employer "systematically obstructed her from performing her job duties as an internal auditor," she failed "to point to a contractual term that existed beyond the at-will employment relationship — her central complaint is that PKS fired her, not that it breached any independent contractual duty"); *McDaniel v. Am. Red Cross*, 58 F. Supp. 2d 628, 634 (W.D. Pa. 1999) ("Pennsylvania recognizes no action for wrongful discharge based upon breach of the duty of good faith and fair dealing in an at-will employment contract."); *cf. Donahue*, 753 A.2d at 242 ("[I]n an at-will employment relationship, the duty of good faith and fair dealing applies to those contractual terms that exist beyond the at-will employment relationship.").

Therefore, this claim is dismissed.

***

As to the remaining two breach of contract claims, Defendants argue that Stein has not alleged that she satisfied the conditions precedent necessary to trigger E4's duties under the contract. (Doc. No. 10-2 at p. 14.)

### vi.     *Failing to Raise Stein's Equity Interest in E4*

Defendants argue that we should dismiss Stein's breach of contract claim based on E4's failure to raise her equity interest in the company because Stein has not alleged that she satisfied the conditions precedent to trigger a duty on E4. (*Id*.) We disagree. Under the offer letter, Stein's equity position in E4 was to "increase to 10% when the company achieves $1M in fee revenue." (Doc. No. 17-1 at p. 5.) In the complaint, Stein alleges that she "brought approximately $1,250,000 in revenue" through the *de facto* merger of Connexion and E4 in late spring 2018. (Doc. No. 1 at ¶ 52.) Although E4 would have us draw a distinction between "revenue" and "fee revenue," we will not do so at this early stage in the proceedings. Neither

term is defined in the contract itself, and despite E4's invitation, we decline at this time to "presume" that "fee revenue" is a "special industry and accounting term[.]"  (Doc. No. 18 at p. 7.)  Taking the allegations in the complaint as true and construing them in Stein's favor, she has alleged that the company received more than $1 million in fee revenue.  The motion to dismiss is denied as to this claim.

### vii.    Failing to Develop and Implement an Incentive Program

As for the final claim related to incentive programs, the complaint alleges that E4 breached the offer letter when it failed to "develop and implement an incentive program for Ms. Stein in E4."  (Doc. No. 1 at ¶ 65.)  The offer letter provides:

> [E4] will implement an[ ] incentive plan for you that will pay you up to 100% of your salary based on exceeding revenue and profit performance objectives.  We will agree [sic] revenue and profit performance targets versus the budget for each year.
>
> The bonus plan will pay you a percentage of the bonus pool (100% of your salary at the start of the calendar/financial year) based on your performance against the targets.  For example you would receive 10% for making the base target and then from 10-100% of the bonus pool for exceeding the targets by certain amounts.

(Doc. No. 17-1 at p. 4.)

Defendants argue that this claim fails because Stein failed to "plead that she met her annual performance targets or that E4 achieved the milestones upon which her eligibility for an incentive plan was conditioned."  (Doc. No. 10-2 at p. 16.)  This argument mischaracterizes Stein's allegations.  Under the offer letter, E4 was required to "implement an[ ] incentive plan."  (Doc. No. 17-1 at p. 4.)  In the complaint, Stein alleges that E4 failed to develop such a plan, and thus denied her additional compensation to which she may have otherwise been entitled.  (Doc. No. 1 at ¶ 65.)  Although Stein's ultimate entitlement to any incentive payments was conditioned on her meeting the plan's "revenue and profit performance objectives," there were *no* conditions precedent to the company's express obligation to implement a plan that identified those

objectives.  The motion to dismiss is denied as to this claim as well.

***

In sum, Count I is dismissed without prejudice as against the individual Defendants.  It is also dismissed without prejudice to the extent Stein argues that E4 breached the offer letter by failing to provide financial information about the individual Defendants or alleges a claim solely for wrongful termination.

### 2. *Count III:  Tortious Interference*

In Count III, Stein claims that "Defendants have tortiously interfered with Ms. Stein's contractual and/or economic relations by, among other things, usurping her client contacts and keeping such client relationships for themselves following their wrongful termination of Ms. Stein."  (Doc. No. 1 at ¶ 73.)  Defendants argue that this count fails as a matter of law because the "contractual relationships about which plaintiff complains were relationships between E4 and its clients," and Stein has not pled that she had independent contractual relationships with them. (Doc. No. 10-2 at pp. 6, 17.)  In the alternative, E4 argues that any interference was privileged and justified because under the employment contract, the relationships belonged to E4.  (*Id.* at pp. 6, 17.)  Stein responds that she has sufficiently alleged that she "had pre-existing client relationships which Defendants coopted."  (Doc. No. 17 at p. 15.)

To state a claim for intentional interference with contractual relations, Stein must allege:

> (1) the existence of a contractual, or prospective contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct.

*Strickland v. Univ. of Scranton*, 700 A.2d 979, 985 (Pa. Super. Ct. 1997).  In the complaint, Stein alleges that E4 "tortiously interfered with Ms. Stein's contractual and economic relations by . . .

21

usurping her client contacts and keeping such client relationship for themselves following their wrongful termination of Ms. Stein." (Doc. No. 1 at ¶ 73.) Defendants argue that per the terms of the offer letter, Stein's original clients belonged to E4 once she had been employed with them for six months. (Doc. No. 10 at p. 17.) Therefore, Stein cannot show that when she was terminated, she continued to have viable contracts with her former clients or that any interference by E4 was unjustified. (*Id.*) Stein does not dispute the unambiguous terms of the offer letter. Instead, she argues that E4 "cannot rely upon or enforce the language of the Offer Letter granting E4 'ownership' of Ms. Stein's clients given Defendants' misconduct and breaches as alleged in the Complaint." (Doc. No. 17 at p. 16.) Defendants do not address this argument in their reply brief. (*See generally* Doc. No. 18.) For the reasons discussed below, we will delay ruling on this issue at this time.

Stein is correct that under Pennsylvania law, "a 'material breach' relieves the non-breaching party of its duty of performance." *Int'l Diamond Imps., Ltd. v. Singularity Clark, L.P.*, 40 A.3d 1261, 1270 (Pa. Super. Ct. 2012); *see also Widmer Eng'g. Inc. v. Dufalla*, 837 A.2d 459, 467 (Pa. Super. Ct. 2003) ("We begin our analysis by noting a settled principle of contract law: a material breach by one party to a contract entitles the non-breaching party to suspend performance."). "While a 'material breach' relieves a non-breaching party of its obligation to perform, [the] law is also clear that 'executed contracts cannot be rescinded or annulled simply because a party found the contract to be burdensome or a financial failure.'" *Int'l Diamond Imps., Ltd.*, 40 A.3d at 1271 (quoting *Umbelina v. Adams*, 34 A.3d 151, 159–60 (Pa. Super. Ct. 2011)); *see also Widmer Eng'g. Inc.*, 837 A.2d at 467 ("If, however, the breach is an immaterial failure of performance, and the contract was substantially performed, the contract remains effective."). For that reason, the "non-breaching party does not have a right to suspend

performance if the breach is not material." *Int'l Diamond Imps., Ltd.*, 40 A.3d at 1271 (quoting *Widmer Eng'g. Inc.*, 837 A.2d at 468–69). In this case, that means Stein can only avoid the client transfer provisions if she can demonstrate that E4 breached the terms of the offer letter in a material way.

"[E]stablishing 'materiality' requires a substantial showing," and Pennsylvania courts usually refer to the factors listed in the Restatement (Second) of Contracts § 241 to determine whether that showing has been satisfied: (1) "the extent to which the injured party will be deprived of the benefit which he reasonably expected;" (2) "the extent to which the injured party can be adequately compensated for that part of the benefit of which he will be deprived;" (3) "the extent to which the party failing to perform or to offer to perform will suffer forfeiture;" (4) "the likelihood that the party failing to perform or offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;" and (5) "the extent to which the behavior of the party failing to perform or offer to perform comports with standards of good faith and fair dealing." *Id.* at 1271 (quoting *Widmer Eng'g. Inc.*, 837 A.2d at 468). "Whether a breach is so substantial as to justify an injured party's regarding the whole transaction as at an end is a question of degree; and must be answered by weighing the consequences in the actual custom of men in the performance of contracts similar to the one that is involved in the specific case." *Id.* (quoting *2401 Pa. Ave. Corp. v. Fed'n of Jewish Agencies of Greater Phila.*, 466 A.2d 132, 139 (Pa. Super. Ct. 1983)).

"[C]ourts consistently have treated inquiries into the materiality of a given breach as fact questions rather than questions of law to be decided from the bench." *Id.* at 1272 (collecting cases); *see also, e.g.*, *Sands v. Wagner*, No. 4:01-CV-1475, 2006 WL 1094555, at *3 (M.D. Pa. Apr. 25, 2006) ("[T]he question whether there has been a material breach is ordinarily for the

jury." (quotation marks omitted)); *Carriage House Condos. GP, Inc. v. Deraimo*, Civil Action No. 07-2120, 2008 WL 2683113, at *3 (E.D. Pa. July 8, 2008) ("Whether a breach of contract constitutes a material breach is generally a question of fact for a jury to decide." (quotation marks omitted)); *Haymond v. Lundy*, No. CIV. A. 99-5048, 2001 WL 15956, at *9 (E.D. Pa. Jan. 5, 2001) ("Whether a breach of contract constitutes a material breach is generally a question of fact for a jury to determine. Unless no reasonable jury could find the breach material, the court will not grant summary judgment." (internal citations omitted)).

Because Defendants did not address this argument in their reply brief, and there are open questions about whether E4 breached the offer letter, the extent of any breach, and the materiality of the provisions breached, we find dismissal inappropriate at this time. If they wish, Defendants may raise their arguments for dismissal of Count III at summary judgment. In doing so, they should address Stein's arguments about materiality and the continued viability of the parties' contract, including the client transfer provisions. *Cf. Int'l Diamond Imps. Ltd.*, 40 A.3d at 1276 (finding open questions of fact as to the materiality of the plaintiff's breach were relevant to whether defendant's interference was privileged).

## IV.     Conclusion

Defendants' motion to dismiss is granted in part and denied in part. Count I is dismissed without prejudice as against the individual Defendants. It is also dismissed without prejudice as against E4 to the extent it asserts a claim for failure to give Stein access to financial information about the individual Defendants or for wrongful termination. Stein may file an amended complaint as to these claims, if she can cure the defects identified in this Memorandum. The motion to dismiss is denied as to the remainder of Count I and the entirety of Count III.

An appropriate order follows.